HAYDEN B. RENWICK v. THE NEWS AND OBSERVER PUBLISHING COMPANY, D/B/A THE RALEIGH TIMES

HAYDEN B. RENWICK v. GREENSBORO NEWS COMPANY ·D/B/A THE GREENSBORO DAILY NEWS AND RECORD

No. 412A83

(Filed 6 March 1984)

### 1. Rules of Civil Procedure § 12— function of motion to dismiss

The function of a motion to dismiss under G.S. 1A-1, Rule 12(b)(6) is to test the law of a claim and not the facts which support the claim, and the allegations of the complaint are taken as true for the limited purpose of testing its sufficiency.

### 2. Rules of Civil Procedure § 12— dismissal of claim for relief

A claim for relief should not be dismissed unless it affirmatively appears that the plaintiff is entitled to no relief under any state of facts which could be presented in support of the claim.

### 3. Libel and Slander §§ 14.1, 14.2— words susceptible of two interpretations—words actionable per quod—insufficiency of complaint

Plaintiff's complaints failed to bring an editorial within the second class of libel since it was not alleged that the editorial is susceptible of two meanings, one defamatory, and that the defamatory meaning was intended and was so understood by those to whom the publication was made. The complaints also failed to bring the editorial within the third class—libel *per quod*—since it was not alleged that the plaintiff suffered special damages.

### 4. Libel and Slander § 2— libel per se

A libel *per se* is a publication by writing, printing, signs or pictures which, when considered alone without innuendo, colloquium or explanatory circumstances: (1) charges that a person has committed an infamous crime; (2) charges a person with having an infectious disease; (3) tends to impeach a person in that person's trade or profession; or (4) otherwise tends to subject one to ridicule, contempt or disgrace.

### 5. Libel and Slander § 14.1— libel per se—insufficiency of complaint

An editorial published by defendants was not subject only to a defamatory interpretation concerning plaintiff and thus was not libelous *per se* where the editorial was not directed toward the plaintiff but criticized the continuing deluge of charges from Washington against the University of North Carolina at Chapel Hill; the thrust of the editorial was to express the opinion that special admissions concessions in effect for blacks at the University contradict and disprove charges from Washington of unfair discrimination against minorities; the only direct mention of the plaintiff, the Associate Dean of the College of Arts and Sciences at Chapel Hill, occurred in the second paragraph of the editorial, which stated that the "latest barrage" of charges from

Washington was based on a 1978 newspaper article written by plaintiff; the editorial stated direct opinions in a robust manner concerning a controversial public issue and took to task unnamed persons who have expressed contrary opinions; and the editorial did not indicate directly or by implication that the plaintiff was "an extremist, a liar and irresponsible in his profession" as alleged by the plaintiff.

**6. Privacy § 1— false light invasion of privacy not recognized**

A separate tort of false light invasion of privacy will not be recognized in this jurisdiction. Rather, a plaintiff must recover in such situations, if at all, in an action for libel or slander.

Justice MEYER concurring in part and dissenting in part.

Justice EXUM dissenting in part and concurring in part.

Justice FRYE dissenting.

APPEAL of right under G.S. 7A-30(2) by the defendants from a decision of a divided panel of the Court of Appeals, 63 N.C. App. 200, 304 S.E. 2d 593 (1983), reversing judgments for the defendants entered by *Judge John C. Martin* on March 3, 1982, in Superior Court, ORANGE County. Heard in the Supreme Court November 7, 1983.

*Kennedy, Kennedy, Kennedy & Kennedy, by Annie Brown Kennedy, Harvey L. Kennedy and Harold L. Kennedy, III, for the plaintiff appellee.*

*Sanford, Adams, McCullough & Beard, by H. Hugh Stevens, Jr., for the defendant appellant, The News and Observer Publishing Company.*

*Smith, Moore, Smith, Schell & Hunter, by Richard W. Ellis and Alan W. Duncan, for the defendant appellant, Greensboro News Company.*

MITCHELL, Justice.

The question before us for review in this consolidated appeal is whether the plaintiff's complaints state a claim upon which relief can be granted against either or both defendants for either libel or invasion of privacy. We hold that the plaintiff's complaints fail to state a claim against either defendant on either theory.

The plaintiff, Hayden B. Renwick, is Associate Dean of the College of Arts and Sciences at the University of North Carolina

at Chapel Hill. He has been employed by the University since 1969. On April 22, 1981, *The Raleigh Times* published an editorial entitled "And He Calls It Bias?". The same editorial was reprinted on April 26, 1981, in *The Greensboro Daily News and Record* in a commentary section entitled "Around The State" under the title "Discrimination?". The complete text of the editorial as printed in both instances was as follows:

> Some of the continuing deluge of charges from Washington against the University of North Carolina at Chapel Hill — many obviously unfounded — are so ridiculous they only widen the gulf between reason and resentment as the state seeks to create better racial relations.
>
> The latest barrage is based on allegations by Hayden Renwick, Associate Dean of the College of Arts and Sciences at Chapel Hill, in a 1978 newspaper article. Renwick, formerly in charge of minority admissions, said between 1975 and 1978 about 800 black students had been denied admission.
>
> Yet Collin Rustin, the minority admissions director since 1975, flatly denies the charge. Furthermore, the special admission concessions in effect for blacks also give the lie to charges of unfair discrimination against minorities.
>
> According to Rustin, every black student who meets the minimum standard combined score of 800 on the Scholastic Aptitude Test and has a 1.6 predicated grade point average is AUTOMATICALLY admitted. The exception would be if the applicant had not taken high school subjects required for admission.
>
> That's discrimination? When the 800 required is only half the maximum possible score of 1,600? When the average SAT score for other, competitive students admitted to last fall's freshman class at Carolina was between 1,070 and 1,080? When those competitive students admitted were in the top five percent of their high school graduating classes? When only 4,800 of 11,500 applicants clamoring to get in were admitted?
>
> It has taken North Carolinians years to adjust to the necessity to grant some minority applicants, because of their disenfranchised background, special *concessions* in admis-

sions. This gives them a chance to prove that their academic deficiencies are only temporary, not permanent.

But extremists who belittle and criticize these concessions—which, indeed seem here so excessive they do nothing for the student or the quality of education—should be publicly rebuffed.

The fact that, according to a 1979 faculty committee report, only 36 blacks have been denied access to UNC between 1975 and 1979—compared to 6,700 competitive students turned away in one season—attests to UNC's yeoman efforts to make minorities welcome on campus. How long highly qualified whites denied admission will tolerate this reverse discrimination without taking the university to court is undoubtedly affected by irresponsible charges such as this one.

After requesting in writing a retraction of the editorials by the defendants and having received no retraction, the plaintiff filed separate complaints against each defendant alleging libel *per se* and invasion of privacy. The defendants, The News and Observer Publishing Company, which publishes *The Raleigh Times*, and Greensboro News Company, which publishes *The Greensboro Daily News and Record*, each filed a motion to dismiss under Rule 12(b)(6) of the Rules of Civil Procedure for failure to state a claim upon which relief could be granted. The trial court entered judgments on March 3, 1982, granting each defendant's motion and dismissing the plaintiff's actions for failure to state a claim. The cases were consolidated for purposes of appeal. A divided panel of the Court of Appeals held that the trial court had erred and reversed. We reverse the holding of the Court of Appeals.

[1, 2] The function of a motion to dismiss under Rule 12(b)(6) is to test the law of a claim and not the facts which support the claim. *Snyder v. Freeman*, 300 N.C. 204, 266 S.E. 2d 593 (1980). The allegations of the complaint are taken as true for the limited purpose of testing its sufficiency. *Presnell v. Pell*, 298 N.C. 715, 260 S.E. 2d 611 (1979). A claim for relief should not be dismissed unless it affirmatively appears that the plaintiff is entitled to no relief under any state of facts which could be presented in support of the claim. *Id.* Bearing these principles in mind, we turn to

a determination of whether the plaintiff's complaints in these two cases state claims entitling the plaintiff to relief.

## I.

### Libel

Three classes of libel are recognized under North Carolina law.

> They are: (1) publications obviously defamatory which are called libel *per se*; (2) publications susceptible of two interpretations one of which is defamatory and the other not; and (3) publications not obviously defamatory but when considered with innuendo, colloquium, and explanatory circumstances become libelous, which are termed libels *per quod.*

*Arnold v. Sharpe*, 296 N.C. 533, 537, 251 S.E. 2d 452, 455 (1979). As we have previously stated:

> When an unauthorized publication is libelous *per se*, malice and damage are presumed from the fact of publication and no proof is required as to any resulting injury. The law presumes that general damages actually, proximately and necessarily result from an unauthorized publication which is libelous *per se* and they are not required to be proved by evidence since they arise by inference of law, and are allowed whenever the immediate tendency of the publication is to impair plaintiff's reputation, although no actual pecuniary loss has in fact resulted.

> In an action upon a publication coming within the second class, that is, a publication which is susceptible of two interpretations, one of which is defamatory, it is for the jury to determine under the circumstances whether the publication is defamatory and was so understood by those who saw it.

> In publications which are libelous *per quod* the innuendo and special damages must be alleged and proved.

*Flake v. Greensboro News Co.*, 212 N.C. 780, 785, 195 S.E. 55, 59 (1938) (citations omitted).

[3] The plaintiff's complaints in these cases failed to bring the editorial complained of within the second class of libel, since it

was not alleged that the editorial is susceptible of two meanings, one defamatory, and that the defamatory meaning was intended and was so understood by those to whom the publication was made. *Id.*; *Wright v. Commercial Credit Company, Inc.*, 212 N.C. 87, 89, 192 S.E. 844, 845 (1937). The complaints failed to bring the editorial within the third class—libel *per quod*—since it was not alleged that the plaintiff suffered special damages. *Flake v. Greensboro News Co.*, 212 N.C. at 785, 195 S.E. at 59. In fact, the plaintiff's counsel stated with commendable candor and accuracy during oral arguments before this Court that these were actions for libel *per se* or not actions for libel at all. Therefore, we are concerned here only with the law relative to libel *per se*. We must determine whether the editorial is defamatory *per se*. If it is not, the defendants were entitled to judgments ordering dismissal of the plaintiff's claims for relief for libel. *Id.*

[4] Under the well established common law[1] of North Carolina, a libel *per se* is a publication by writing, printing, signs or pictures which, when considered alone without innuendo, colloquium or explanatory circumstances: (1) charges that a person has committed an infamous crime; (2) charges a person with having an infectious disease; (3) tends to impeach a person in that person's trade or profession; or (4) otherwise tends to subject one to ridicule, contempt or disgrace. *Flake v. Greensboro News Co.*, 212 N.C. at 787, 195 S.E. at 60. It is not always necessary that the publication involve an imputation of crime, moral turpitude or immoral conduct. *Arnold v. Sharpe*, 296 N.C. at 537, 251 S.E. 2d at 455. "But defamatory words to be libelous *per se* must be susceptible of *but one meaning* and of such nature that *the court* can presume *as a matter of law* that they tend to disgrace and degrade the party or hold him up to public hatred, contempt or ridicule, or cause him

---

1. As we base our holding that the defendants were entitled to dismissal of the plaintiff's purported claims for libel *per se* exclusively upon the law of libel of this State, we need not decide whether the plaintiff is a public figure such as to bring into play the constitutional limitations on state libel actions first announced in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). Therefore, we do not consider whether the plaintiff is a public figure either by reason of his position or by reason of having thrust himself to the forefront of a public controversy in order to influence its resolution. *See generally Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), *cert. denied*, --- U.S. ---, 103 S.Ct. 1233, 75 L.Ed. 2d 467 (1983). For the same reason we neither reach nor consider the several defenses based on First Amendment principles which the defendants contend apply.

to be shunned and avoided." *Flake v. Greensboro News Co.*, 212 N.C. at 786, 195 S.E. at 60 (emphasis added).

The initial question for the court in reviewing a claim for libel *per se* is whether the publication is such as to be subject to only one interpretation. *Oates v. Wachovia Bank & Trust Co.*, 205 N.C. 14, 16, 169 S.E. 869, 871 (1933). If the court determines that the publication is subject to only one interpretation, it then "is for the court to say whether that signification is defamatory." *Id.* It is only after the court has decided that the answer to both of these questions is affirmative that such cases should be submitted to the jury on a theory of libel *per se.*

[5] We turn then to the question whether the editorial published and republished by the defendants is susceptible of but one interpretation, which is defamatory when considered alone without innuendo or explanatory circumstances. We find that it is not. The worst that could be said of the editorial is that it is "reasonably susceptible of a defamatory meaning." 63 N.C. App. at 213, 304 S.E. 2d at 601. However, we find the editorial, at the very least, equally susceptible of a nondefamatory interpretation. Therefore, it could not be libelous *per se. Flake v. Greensboro News Co.*, 212 N.C. at 786, 195 S.E. at 60; *Oates v. Wachovia Bank & Trust Co.*, 205 N.C. at 16-17, 169 S.E. at 871.

In determining whether publications are susceptible of only one meaning, and that a defamatory meaning, so as to be libelous *per se*:

> The principle of common sense requires that courts shall understand them as other people would. The question always is how would ordinary men naturally understand the publication . . . . The fact that supersensitive persons with morbid imaginations may be able, by reading between the lines of an article, to discover some defamatory meaning therein is not sufficient to make them libelous.

> In determining whether the article is libelous *per se* the article alone must be construed, stripped of all insinuations, innuendo, colloquium and explanatory circumstances. The article must be defamatory on its face "within the four corners thereof."

*Flake v. Greensboro News Co.*, 212 N.C. at 786-87, 195 S.E. at 60 (citations omitted).

In each of his complaints against the defendants, the plaintiff specifically complained that in the editorial in question:

plaintiff is reported as having said in a 1978 newspaper article that between 1975 and 1978 about 800 black students had been denied admission. That said statement is false. That the entire article . . . gives the impression that the plaintiff is an extremist, a liar and is irresponsible in his profession.

We do not think such allegations can find support in the editorial of which the plaintiff complains.

The editorial giving rise to this appeal when viewed "within the four corners thereof" and as ordinary people would understand it simply is not directed toward the plaintiff. Instead, it criticizes "the continuing deluge of charges from Washington against the University of North Carolina at Chapel Hill." The thrust of the editorial is to express the opinion that special admissions concessions in effect for blacks at the University contradict and disprove *charges from Washington* of unfair discrimination against minorities. In fact, the only direct mention of the plaintiff occurs in the second paragraph of the editorial, which states that the "latest barrage" of charges *from Washington* is based on a 1978 newspaper article written by him. The editorial states direct opinions in a robust manner concerning a controversial public issue and takes to task unnamed persons who have expressed contrary opinions. It does not indicate directly or by implication that the plaintiff is "an extremist, a liar and irresponsible in his profession," as alleged by the plaintiff.

We do not find the editorial to be "of such nature that the court can presume as a matter of law that [it tends] to disgrace and degrade the party or hold him up to public hatred, contempt or ridicule, or cause him to be shunned and avoided." *Flake v. Greensboro News Co.*, 212 N.C. at 786, 195 S.E. at 60. Although every defamation must be false, not every falsehood is defamatory. Here, neither the statement that the defendant wrote such

a 1978 newspaper article nor the characterization of that article are defamatory even if they are untrue.[2]

The majority in the Court of Appeals concluded that the editorial charged that the plaintiff was irresponsible and:

> ordinary men would naturally understand the editorial to imply or insinuate that plaintiff's statistics regarding the number of blacks denied admission to UNC between 1975 and 1979 were either knowingly and intentionally false, or the result of gross incompetence in the conduct of plaintiff's profession.

63 N.C. App. at 211-12, 304 S.E. 2d at 600. We have concluded, on the other hand, that the most obvious and natural meaning to be accorded the editorial in question does not tend to defame the plaintiff. Certainly, the editorial at worst is susceptible of two interpretations one of which is defamatory and the other not. When a publication is susceptible of two interpretations, one defamatory and the other not, it will not support an action for a libel of the first class — a libel based upon a publication obviously defamatory which is libel *per se. Arnold v. Sharpe*, 296 N.C. at 537, 251 S.E. 2d at 455. As previously pointed out, the plaintiff's complaints failed to allege any class of libel other than libel *per se.* The trial court correctly dismissed the plaintiff's complaints for failure to state a claim for libel upon which relief could be granted. That part of the opinion of the Court of Appeals to the contrary on this issue must be reversed.

## II.

### Invasion of Privacy

[6] In each of the cases giving rise to this appeal the plaintiff alleged as a second claim for relief that the editorials published by the defendants "placed the plaintiff in a false light before the public and constituted an invasion of the plaintiff's privacy." The trial court entered judgments allowing the defendants' motions to

---

2. No article written by the plaintiff has been made a part of the record on appeal. The defendants urge us to take judicial notice of the article contending that it was published in *The Chapel Hill Newspaper*, September 17, 1978, p. 3-C, and is a matter of public knowledge. We have chosen in our discretion not to take judicial notice of any such article.

dismiss these claims. The Court of Appeals was of the opinion that the complaint stated a valid claim for relief for false light invasion of privacy. 63 N.C. App. at 241, 304 S.E. 2d at 617. We will not expand the tort of invasion of privacy recognized in this jurisdiction to include "false light" invasions of privacy. We reverse the Court of Appeals on this issue.

The existence of a right of privacy recognizable in law appears to have originated in a law review article by Samuel D. Warren and his law partner Louis D. Brandeis, later to become a Justice of the Supreme Court of the United States, which was published in the Harvard Law Review in 1890. Warren and Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193 (1890). Warren and his wife, the daughter of Senator Bayard of Delaware, were among the social elite of Boston. This was during the era of "yellow journalism," and the newspapers of Boston were specializing in articles embarrassing to "blue bloods."

> The matter came to a head when the newspapers had a field day on the occasion of the wedding of a daughter, and Mr. Warren became annoyed. It was an annoyance for which the press, the advertisers and the entertainment industry of America were to pay dearly over the next seventy years.

Prosser, *Privacy*, 48 Calif. L. Rev. 383 (1960). The article by Warren and Brandeis had a profound and almost immediate impact and "has come to be regarded as the outstanding example of the influence of legal periodicals upon the American law." *Id.*

The tort of invasion of privacy is now recognized, in one or more of its forms, in a majority of jurisdictions. *See generally*, W. Prosser, Handbook of the Law of Torts, §§ 117, 118 (4th Ed. 1971). It is generally recognized that:

> The right of privacy, as an independent and distinctive legal concept has two main aspects: (1) the general law of privacy, which affords a tort action for damages resulting from an unlawful invasion of privacy, and (2) the constitutional right of privacy which protects personal privacy against unlawful governmental invasion.
>
> The general law of the right of privacy, as a matter of tort law, is mainly left to the law of the states . . . .

Annotation, *Supreme Court's Views As To The Federal Legal Aspects Of The Right Of Privacy*, 43 L.Ed. 2d 871, 875-76. A review of the current tort law of all American jurisdictions reveals cases identifying at least four types of invasion of four different interests in privacy: (1) appropriation, for the defendant's advantage, of the plaintiff's name or likeness; (2) intrusion upon the plaintiff's seclusion or solitude or into his *private affairs*; (3) public disclosure of embarrassing *private* facts about the plaintiff; and (4) publicity which places the plaintiff in a false light in the public eye. *See* W. Prosser, Handbook of the Law of Torts § 117 (4th Ed. 1971) (emphasis added).

This Court was first called upon to consider a claim for invasion of privacy in *Flake v. Greensboro News Co.*, 212 N.C. 780, 195 S.E. 55 (1938). In that case we were concerned, as were the courts of all jurisdictions when considering the early cases, primarily "with the question whether the right of privacy existed at all, and gave little or no consideration to what it would amount to if it did." W. Prosser, Handbook of the Law of Torts § 117 at 804 (4th Ed. 1971).

In *Flake* we held that a right of privacy existed and for the first time held that an invasion of privacy by the appropriation of a plaintiff's photographic likeness for the defendant's advantage as a part of an advertisement constitutes a tort giving rise to a claim for relief recognizable at law. Although *Flake* involved overtones of "false light" publicity, we neither reached nor decided the precise question presented by the plaintiff here—whether publicity by a defendant which places a plaintiff in a false light before the public gives rise to a claim for which relief can be granted upon a theory of invasion of privacy. We now hold that such facts do not give rise to a claim for relief for invasion of privacy. A plaintiff must recover in such situations, if at all, in an action for libel or slander.

In *Flake*, we specifically noted that questions surrounding the right of privacy involved "a relatively new field in legal jurisprudence. In respect to it the courts are plowing new ground and before the field is fully developed unquestionably perplexing and harassing stumps and runners will be encountered." *Flake v. Greensboro News Co.*, 212 N.C. at 790, 195 S.E. at 62-63. We also specifically noted that the question of the extent to which a

newspaper may publish information concerning an individual "necessarily involves a consideration of the constitutional right of free speech and of a free press." *Id.* We now have the advantage of almost a half century of cases decided subsequent to *Flake* in this and other jurisdictions for our consideration in deciding whether to recognize a separate tort of false light invasion of privacy in addition to the torts of libel and slander already well recognized in this jurisdiction. Our continuing "consideration of the constitutional right of free speech and of a free press" guaranteed by the First Amendment to the Constitution of the United States, as well as a proper interest in judicial efficiency, leads us to reject the concept of a separate tort of false light invasion of privacy.

Two basic concerns argue against the recognition of a separate tort of false light invasion of privacy. First, any right to recover for a false light invasion of privacy will often either duplicate an existing right of recovery for libel or slander or involve a good deal of overlapping with such rights. Second, the recognition of a separate tort of false light invasion of privacy, to the extent it would allow recovery beyond that permitted in actions for libel or slander, would tend to add to the tension already existing between the First Amendment and the law of torts in cases of this nature.

Some commentators have specifically expressed concerns as to whether a tort of false light invasion of privacy would overwhelm existing laws of libel and slander. *See* Wade, *Defamation and the Right of Privacy*, 15 Vand. L. Rev. 1093 (1962). It has often been recognized that claims for false light invasion of privacy and claims for libel or slander are at least very similar and that many of the same considerations apply to each type of claim. *See e.g.* Restatement (Second) of Torts §§ 652 E, F, G (1977); Hill, *Defamation and Privacy under the First Amendment*, 76 Colum. L. Rev. 1205, 1207 (1976); Lusky, *Invasion of Privacy: A Clarification of Concepts*, 72 Colum. L. Rev. 693 (1972); Warren and Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193 (1890).

As early as 1960 one respected authority pointed out that:

> The false light cases obviously differ from those of intrusion, or disclosure of private facts. The interest protected is clearly that of reputation, with the same overtones of mental

distress as in defamation. There is a resemblance to disclosure; but the two differ in that one involves truth and the other lies, one private or secret facts and the other invention. Both require publicity. There has been a good deal of overlapping of defamation in the false light cases, and apparently either action, or both, will very often lie. The privacy cases do go considerably beyond the narrow limits of defamation, and no doubt have succeeded in affording a needed remedy in a good many instances not covered by the other tort.

It is here, however, that one disposed to alarm might express the greatest concern over where privacy may be going. The question may well be raised, and apparently still is unanswered, whether this branch of the tort is not capable of swallowing up and engulfing the whole law of public defamation; and whether there is any false libel printed, for example, in a newspaper, which cannot be redressed upon the alternative ground. If that turns out to be the case, it may well be asked, what of the numerous restrictions and limitations which have hedged defamation about for many years, in the interest of freedom of the press and the discouragement of trivial and extortionate claims? Are they of so little consequence that they may be circumvented in so casual and cavalier a fashion?

Prosser, *Privacy*, 48 Calif. L. Rev. 383, 400-401 (1960).

An answer was not long in coming to at least some of the questions raised by Dean Prosser. In cases decided prior to 1964, occasional concern had been expressed about the potential of claims for invasion of privacy to conflict with First Amendment rights of free speech and press. *See e.g. Flake v. Greensboro News Co.*, 212 N.C. at 790, 195 S.E. at 63. In 1964, the Supreme Court of the United States decided *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) which held that the First Amendment itself imposes limitations upon state claims for libel or slander. In 1967, the Supreme Court decided *Time, Inc. v. Hill*, 385 U.S. 374 (1967) which extended First Amendment protections *at least* as stringent as those required by *Sullivan* to defendants in cases for false light invasion of privacy. *See* Restatement (Second) of Torts § 652E comment d (1977). "By this decision, and others which followed it, the two branches of invasion of privacy which turn on

publicity were taken over under the Constitutional Privilege. The other two, however, are pretty clearly not." W. Prosser, Handbook of the Law of Torts § 118 at 827 (4th Ed. 1971).

In those jurisdictions recognizing the tort of false light invasion of privacy, the false light need not necessarily be a defamatory light. *See* Zolich, *Laudatory Invasion of Privacy,* 16 Clev. Marsh. L. Rev. 532, 540 (1967). In many if not most cases, however, the false light is defamatory and an action for libel or slander will also lie. W. Prosser, Handbook of the Law of Torts, § 117 at 813 (4th Ed. 1971).

We believe that we will:

> create a grave risk of serious impairment of the indispensable service of a free press in a free society if we saddle the press with the impossible burden of verifying to a certainty the facts associated in news articles with a person's name, picture or portrait, *particularly as related to nondefamatory matter.*

*Time, Inc. v. Hill,* 385 U.S. 374, 389 (1967) (emphasis added). This is especially true since plaintiffs in actions for invasions of privacy are entitled to nominal damages and in some cases to injunctive relief—*a prior restraint*—without allegation or proof of special damages. *Flake v. Greensboro News Co.,* 212 N.C. at 792, 195 S.E. at 64.

The conditions which led Warren and Brandeis to argue almost a century ago for a separate tort of invasion of privacy have at least to some extent subsided. Most modern journalists employed in print, television or radio journalism now receive formal training in ethics and journalism entirely unheard of during the era of "yellow journalism." As a general rule journalists simply are more responsible and professional today than history tells us they were in that era. Our recognition of these facts is entitled to some weight in deciding the question before us, even though we are completely aware that nothing in the First Amendment mandates that members of the news media be responsible or professional. As regards this, however, we cannot improve upon the statement of James Madison that:

Some degree of abuse is inseparable from the proper use of every thing, and in no instance is this more true than in that of the press.

It has accordingly been decided . . . that it is better to leave a few of its noxious branches to their luxuriant growth, than by pruning them away, to injure the vigor of those yielding the proper fruits.

4 Elliot's Debates on the Federal Constitution 571 (1876 Ed.).

Given the First Amendment limitations placed upon defamation actions by *Sullivan* and upon false light invasion of privacy actions by *Hill*, we think that such additional remedies as we *might* be required to make available to plaintiffs should we recognize false light invasion of privacy claims are not sufficient to justify the recognition in this jurisdiction of such inherently constitutionally suspect claims for relief. Additionally, the recognition of claims for relief for false light invasions of privacy would reduce judicial efficiency by requiring our courts to consider two claims for the same relief which, if not identical, would not differ significantly.

We reject the notion of a claim for relief for false light invasion of privacy in this jurisdiction. The trial court correctly dismissed the plaintiff's claims based upon this theory for failure to state a claim upon which relief could be granted.

The opinion of the Court of Appeals, holding that the trial court erred in dismissing the plaintiff's claims for relief for failure to state a claim upon which relief could be granted within the meaning of Rule 12(b)(6), is reversed. The cases comprising this consolidated appeal are remanded to the Court of Appeals for further remand to the Superior Court, Orange County, for reinstatement of the judgments entered by the trial court dismissing the plaintiff's claims against these defendants.

Reversed and remanded.

Justice MEYER concurring in part and dissenting in part.

At the outset I hasten to say that, for the reasons stated by the majority, I agree that the complaint fails to allege a libel of

the first class—a libel *per se*. Nor does it allege a libel of the second class as plaintiff did not allege that the editorial is susceptible of two meanings, one defamatory, and that the defamatory meaning was intended and was so understood by those to whom the publication was made. The complaint likewise fails to allege a cause of action for a libel of the third class—libel *per quod*—since it was not alleged that the plaintiff suffered special damages. While certain allegations of the complaint might be interpreted to allege special damages, the complaint refers to those allegations as supporting only a libel *per se*. Further, plaintiff conceded during oral argument that the complaint alleges libel *per se, i.e.*, a libel of the first class, or no libel at all.

I dissent from that portion of the majority opinion which addresses the issue of the false light invasion of privacy cause of action. Specifically, I do not agree with the majority opinion in its result on this issue—that no cause of action for false light invasion of privacy exists in this State, nor with the reasoning which guided the majority to that result. While there is indeed some overlapping in our existing action for libel *per quod* and false light invasion of privacy, they are not and should not be exclusive each of the other.

The distinctions between the defamation (libel and slander) and invasion of privacy torts are often blurred. While the interest protected in defamation actions is one's reputation or good name, the interest protected in invasion of privacy actions is often characterized as one's right to privacy or, simply stated, one's right to be let alone. In false light actions it is not necessary that the publication be defamatory or that special damages be alleged. Whereas truth is an absolute defense in the defamation actions, it is not in the invasion of privacy actions, except in the false light cases. This is so because, in privacy actions, it is not just the inaccuracy of the matter published which is of concern but the mere fact that the matter is published.

Our courts have long recognized a cause of action for invasion of privacy. *Flake v. Greensboro News Co.*, 212 N.C. 780, 195 S.E. 55 (1938); *Brown v. Boney*, 41 N.C. App. 636, 255 S.E. 2d 784, *disc. rev. denied*, 298 N.C. 294, 259 S.E. 2d 910 (1979); *Barr v. Telephone Co.*, 13 N.C. App. 388, 185 S.E. 2d 714 (1972). While I cannot agree with the statement of the Court of Appeals that

these are "false light" cases, they are indeed invasion of privacy cases.

A number of state and federal courts have recognized actions for false light invasion of privacy. *See Dodrill v. Arkansas Democrat Co.*, 265 Ark. 628, 590 S.W. 2d 840 (1979), *cert. denied, Little Rock Newspapers, Inc. v. Dodrill,* 444 U.S. 1076, 62 L.Ed. 2d 759 (1980); *Goodrich v. Waterbury Republican-American, Inc.,* 188 Conn. 107, 448 A. 2d 1317 (1982); *Harrison v. Washington Post Co.,* 391 A. 2d 781 (App. D.C. 1978); *Winegard v. Larsen,* 260 N.W. 2d 816 (Iowa 1977); *Froelich v. Adair,* 213 Kan. 357, 516 P. 2d 993 (1973); *McCall v. Courier-Journal & Louisville Times Co.,* 623 S.W. 2d 882 (Ky. 1981), *cert. denied,* 456 U.S. 975, 72 L.Ed. 2d 849 (1982); *McCormack v. Oklahoma Publishing Co.,* 613 P. 2d 737 (Okla. 1980).

The elements of a false light invasion of privacy claim though variously stated include (1) publication (2) of a false statement concerning the plaintiff which places plaintiff in a false light that would be offensive to a reasonable person in plaintiff's position. The essence of the term "false light" is a major misrepresentation of a person's character, history, activities or beliefs which places that person in an objectionable false position before the party or parties to whom it is communicated.

The Restatement has significantly tightened the elements by requiring that the false statement be "material," that the matter be "highly offensive" rather than simply "offensive," and that the actor know the material published is false or that the publication was made in reckless disregard as to the falsity of the material. *See* Restatement (Second) of Torts § 652E; *see also* False Light: Invasion of Privacy? 15 Tulsa Law Journal 113 (1979).

Plaintiff's claim is consistent with Restatement (Second) of Torts §  652E, entitled "Publicity Placing a Person In False Light," which provides:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or

acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

The Court of Appeals in *Renwick* related the following concerning false light invasion of privacy:

> For liability to attach under Section 652E, it is essential that the matter publicized be untrue, although it is not necessary for the matter to be defamatory. Section 652E, Comment b. It is sufficient if the matter published attributes to the plaintiff characteristics, conduct or beliefs that are false so that he is portrayed before the public in a false position. *Id.; Brown v. Boney, supra,* at 648, 255 S.E. 2d at 791. An action for defamation and a claim for false light invasion of privacy, however, are closely allied and the same considerations apply to each. *Cibenko v. Worth Publishers, Inc.,* 510 F. Supp. 761 (D.N.J. 1981); Hill, Defamation and Privacy under the First Amendment, 76 Colm. L. Rev. 1205, 1207 (1976). It is for the Court to determine whether the communication in question is capable of bearing a particular meaning which is highly offensive to a reasonable person. *Cibenko, supra* at 766.

63 N.C. App. at 240, 304 S.E. 2d at 617.

I agree with the Court of Appeals that so much of the editorial as is contained in the complaint is reasonably capable of conveying the offensive meaning or the innuendo ascribed by the plaintiff as the basis for his invasion of privacy claim.

A cause of action for both false light invasion of privacy and libel may be joined in the same action. *See Varnish v. Best Medium Publishing Co.,* 405 F. 2d 608 (2nd Cir. 1968). However, there can be but one recovery for any particular publication. Restatement (Second) of Torts § 652E, Comment b. *See* 62 Am. Jur. 2d Privacy § 5 (1972).

I do not share the majority's fear of conflict between our recognition of a false light invasion of privacy cause of action and the First Amendment limitations placed upon defamation actions by *Sullivan* and upon false light invasion of privacy actions by *Hill.* For an examination of this problem, *see* "Privacy: The Search for a Standard," 11 Wake Forest L. Rev. 659 (1975). The Court of Appeals has adequately and accurately addressed the is-

sues relating to constitutional privilege in some thirty-three pages of its fifty-four page opinion in this case. The Court of Appeals' treatment of the constitutional issues is both scholarly and convincing. The First Amendment provides no absolute protection for any individual or member of the news media to make false material statements of fact and then to draw defamatory conclusions therefrom.

I agree with the Court of Appeals that the complaint states a valid claim for relief for false light invasion of privacy. 63 N.C. App. at 241, 304 S.E. 2d at 617. I believe that such a cause of action should obtain in North Carolina. I would vote to modify and affirm the decision of the Court of Appeals.

Justice EXUM dissenting in part and concurring in part.

I dissent from the majority's conclusion that these complaints do not state claims for libel *per se.* The editorial on which the complaints are based identify plaintiff as "Associate Dean of the College of Arts and Sciences at Chapel Hill [and] formerly in charge of minority admissions." The editorial then asserts that plaintiff in a 1978 newspaper article said 800 black students had been denied admission to the university between 1975 and 1978. Thereafter, the editorial asserts that plaintiff's 1978 statement was "flatly" denied by the present minority admissions director and that a 1979 faculty committee report showed only 36 blacks to have been denied admission between 1975 and 1979. The editorial ends by a reference to "irresponsible charges *such as this one.*" (Emphasis supplied.) Clearly, the last reference is to plaintiff's statement in his 1978 newspaper article. The entire thrust of the editorial is this: The "latest barrage" of "charges from Washington" is based on plaintiff's 1978 statement regarding black admissions to the university. Plaintiff's 1978 statement is wrong and grossly overstates the number of blacks denied admission. Plaintiff was then in a position to know what the true facts were. Plaintiff's 1978 statement is "irresponsible."

Certainly these assertions in the editorial tend to "impeach" plaintiff in his position as Associate Dean of the College of Arts and Sciences. They also tend to subject him to ridicule, contempt, or disgrace. If the assertions are false and made with malice they constitute libel *per se.*

Plaintiff alleges that insofar as the editorial asserts that he said "between 1975 and 1978 about 800 black students had been denied admission" the editorial is false. He also alleges that the editorial was published by both defendants "with knowledge of [its] falsity or with reckless disregard for the truth, and with actual malice." For purposes of the motion to dismiss the complaint, we must, of course, assume that these allegations are true.

I am satisfied the complaints have alleged a claim for libel *per se.*

I concur in Part II of the majority opinion.

For the foregoing reasons I vote to modify and affirm the decision of the Court of Appeals.

Justice FRYE dissenting.

In this case, the trial court dismissed the plaintiff's claims on the pleadings for failure to state a claim upon which relief could be granted. The Court of Appeals reversed, holding that the complaints give defendants sufficient notice of the nature and basis of plaintiff's claims to enable them to answer and to prepare for trial. I agree with that decision.

A motion to dismiss under Rule 12(b)(6) of the Rules of Civil Procedure for failure to state a claim upon which relief can be granted should not be allowed "unless it affirmatively appears that plaintiff is entitled to no relief under any state of facts which could be presented in support of the claim." *Presnell v. Pell,* 298 N.C. 715, 719, 260 S.E. 2d 611, 613 (1979).

For the reasons stated in Justice Exum's dissenting and concurring opinion as to Part I, I believe that the complaints, taken in their entirety, state a claim for relief for libel *per se.* I also agree with that portion of Justice Meyer's dissenting and concurring opinion which concludes that the complaints state a valid claim for false light invasion of privacy and that such a cause of action should obtain in North Carolina. Accordingly, I would vote to affirm the decision of the Court of Appeals.